1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9

10   CAMERON ATKINSON,                    Case No.  20-cv-05546-RS

            Plaintiff,

11

        v.

12                                        **ORDER GRANTING MOTION TO**
                                          **DISMISS**
13   FACEBOOK INC., et al.,

            Defendants.

14

15                             **I. INTRODUCTION**

16          On transfer from the District of Connecticut, Plaintiff Cameron Atkinson brings a

17   collection of claims against Facebook, Inc. ("Facebook") and Mark Zuckerberg accusing the social

18   media platform of intentionally and malevolently censoring his speech. Atkinson complains that

19   Facebook wrongly removed or refused to publish four of his posts and, in doing so, violated, *inter*

20   *alia*, a contract between the parties, the First Amendment, and the Communications Decency Act

21   ("CDA").[1] For the reasons set forth below, the Motion to Dismiss is granted. Because Atkinson

22   conceded at oral argument that he has no supplementary facts to add, the dismissal is without

23   _____

24   [1]Atkinson concedes that this dispute is governed by California law, which necessarily sinks his
     Connecticut Unfair Trade Practices Act claim. Consequently, he clarifies that he will request

25   permission to amend his Complaint to state a claim under California's "Unfair Practices Act." He
     also intends to withdraw his fraud cause of action, which is therefore dismissed. Any motion to

26   amend to add a new a claim under the Unfair Competition Law of California, Cal. Bus. & Prof.
     Code § 17200, must be denied for two reasons. First, Atkinson cannot allege that he has lost

27   "money or property," a prerequisite to statutory standing. *See Kwikset Corp. v. Superior Court*, 51
     Cal.4th 310, 320 – 21 (2011). Second, as set forth below, Facebook is immune from such state law

28   causes of action under the CDA.

United States District Court
Northern District of California

further leave to amend.

## II. BACKGROUND[2]

Throughout the 2016 presidential election, Facebook was accused of selling data to Cambridge Analytica and, in turn, Russian intelligence, which weaponized the information to influence American voters. In response to the threat of increased government regulation, Atkinson alleges, Facebook created vague community standards to "assuage an angry public and ultimately to protect its own financial interests." Complaint ("Compl.") ¶ 12. Three years later, Atkinson learned that, pursuant to these community standards, Facebook was routinely removing posts that named the whistleblower whose complaint to the Intelligence Community Inspector General prompted impeachment proceedings against President Donald Trump. In order to test the veracity of the charges of censorship, Atkinson composed two test posts and a third more nuanced reflection, all using the whistleblower's name. The first praised the whistleblower as a "hero for blowing the whistle on the Trump Administration's treason with Ukraine." Compl. ¶ 23. The second called the whistleblower a "dirty lying rat." Compl. ¶ 24. Within five hours, both posts had been removed without warning or notification. Soon after, Atkinson posted the third, neutral post communicating his "conflicting thoughts" about the whistleblower. It was promptly removed. Atkinson maintains that he has never received an explanation.

About six months after filing this action, Atkinson received permission from the Connecticut District Court to file a Supplemental Complaint. In it, he describes his interactions with Facebook since he filed suit. Generally, Atkinson holds the "sincere opinion that the current government measures to combat coronavirus are blatantly unconstitutional and have resulted in a suspension of constitutional liberties for all Americans." Supplemental Complaint ("Supp. Compl.") ¶ 8. To that end, when he noticed a CNN article in which a Facebook spokesperson

---

[2] The factual background is based on the allegations in the original and supplemental complaints, which must be taken as true for purposes of this motion, as well as documents which may be incorporated by reference or of which judicial notice may be taken. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

1    issued a statement purportedly confirming Facebook's consultation with state officials "as to

2    which posts were organizing protests against 'stay-at-home' orders and promoting 'illegal'

3    behavior" and removal of posts coordinating mask protests in California, New Jersey, and

4    Nebraska, he authored an article condemning the purported censorship.[3] Supp. Compl. ¶¶ 10 – 11.

5    Then, despite seven attempts to post the article, entitled "I Sued Facebook For Coordinating

6    Speech Censorship With Governments. Today, They Admitted It.," it was never shared. Supp.

7    Compl. ¶ 12. The same post was instantly and successfully shared on LinkedIn and Twitter.

### III. LEGAL STANDARD

9            Under the Federal Rules of Civil Procedure, a complaint must contain a short and plain

10   statement of the claim showing the pleader is entitled to relief. Fed. R. Civ. P. 8(a). While

11   "detailed factual allegations" are not required, a complaint must have sufficient factual allegations

12   to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

13   (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). A motion to dismiss under Rule

14   12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus.,*

15   *Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be

16   based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts

17   alleged" under a cognizable legal theory. *UMG Recordings, Inc. v. Shelter Capital Partners LLC*,

18   718 F.3d 1006, 1014 (9th Cir. 2013). "Threadbare recitals of the elements of a cause of action,

19   supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. When

20   evaluating such a motion, courts generally "accept all factual allegations in the complaint as true

21   and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*,

22   393 F.3d 1068, 1072 (9th Cir. 2005). However, courts "need not accept as true allegations that

23   contradict matters properly subject to judicial notice or by exhibit." *Gonzalez v. Planned*

24   *Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014).

---

[3] Atkinson attaches the article to his Supplemental Complaint, so it may be considered "a part of the pleading for all purposes." *See* Fed. R. Civ. P. 10(c).

*United States District Court*
*Northern District of California*

# IV. DISCUSSION

At the outset, Facebook requests judicial notice, pursuant to Federal Rule of Evidence 201, be taken of two documents: (1) Facebook's Motion to Dismiss, or, in the Alternative, to Transfer and accompanying declaration of Nicholas Wong filed in *Atkinson v. Facebook, Inc., et al.,* No. 3:19-cv-01785-JCH (D. Conn.) and (2) Plaintiff's Opposition to the same motion. Facebook seeks judicial notice of those documents to establish Atkinson's concession that he agreed to Facebook's Terms of Service at the outset of their contractual relationship. It also seeks incorporation by reference of the actual terms of that contract, originally attached to the declaration of Nicholas Wong. Atkinson does not object to either request.

Atkinson not only concedes in his Opposition to the current motion but in fact pleads, in both his Complaint and Supplemental Complaint, that the parties entered into contracts concerning the terms and conditions of Facebook's services. So, while superfluous, Facebook's request for judicial notice is granted because a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Its concurrent request to incorporate by reference the terms of the contract is granted because all the contract causes of action "necessarily re[ly]" on the terms of the contract. *See Corinthian Colleges*, 655 F.3d at 999.

## 1. First Amendment

It is axiomatic that the "Free Speech Clause of the First Amendment prohibits the government – not a private party – from abridging speech." *Prager Univ. v. Google LLC*, 951 F.3d 991, 996 (9th Cir. 2020). Neither party disputes that Facebook and Mark Zuckerberg are a private entity and individual, respectively. Thus, before the substance of Atkinson's First Amendment claims may be considered, he must make a showing that Facebook is (i) conducting a quintessential public function, (ii) being compelled by the government to take a particular action, or (iii) acting jointly with the government. *See Manhattan Cmty Access Corp. v. Halleck*, 139 S.Ct. 1921, 1928 (2019).

### A. The Public Function Exception

Atkinson describes Facebook as having a "dominant position in control of access to the

Internet" which "gives it a quasi-monopolistic power over a quintessential public forum." Compl. ¶ 45. In his Complaint, he quotes *Packingham v. North Carolina* for the proposition that the "vast democratic forums of the Internet" are the most important place for the exchange of views in modern America. *See* 137 S.Ct. 1730, 1735 (2017); Compl. ¶ 6.[4] Consequently, he argues that social networks like Facebook are akin to the public squares and meeting places conventionally managed by the government. The operation of these social networks, then, is an "exercise by a private entity of powers traditionally exclusively reserved to the State." *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974).

These arguments have been considered and rejected before. In *Halleck*, the Supreme Court stated that "hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment constraints." 139 S.Ct. at 1930. Moreover, the Ninth Circuit, just this year, declined to find that YouTube was performing a traditional government function by hosting speech on its private platform. *Prager*, 951 F.3d at 998. It applied the principle in *Halleck* directly to a social media platform: "YouTube does not perform a public function by inviting public discourse on its property." *Id.*

Atkinson does not differentiate Facebook from YouTube or other social networks that primarily host the speech of others. He does not grapple with this Circuit's precedent. Instead, he attempts to craft a niche for Facebook among completely unrelated, recognized public functions such as the maintenance of bridges, ferries, turnpikes, and railroads. *See Marsh v. State of Ala.*, 326 U.S. 501, 506 (1946). Indeed, he acknowledges that his use of Facebook is to "engage in debate with the community of fellow law students and other friends whose respect he has gained." Compl. ¶ 20. The Ninth Circuit reasoned that though YouTube provides "a paradigmatic public square on the Internet," it is not transformed into a state actor by providing a platform for speech

---

[4] As the Ninth Circuit has noted, reliance on *Packingham* is inapposite where, as here, the dispute revolves around a private entity's regulation of online speech, not the government's. *Prager*, 951 F.3d at 996 n.2.

United States District Court
Northern District of California

1   and the exchange of ideas. *See Prager*, 951 F.3d at 998. Neither is Facebook.

2       **B.  The Entwinement Exception**

3       When "such a close nexus" characterizes the relationship between a state and a private

4   entity, private behavior may be treated as state action. *Villegas v. Gilroy Garlic Festival Ass'n*,

5   541 F.3d 950, 955 (9th Cir. 2008) (internal citations omitted). Some factors bear on the nexus

6   determination: whether "(1) the organization is mostly comprised of state institutions; (2) state

7   officials dominate decision making of the organization; (3) the organization's funds are largely

8   generated by the state institutions; and (4) the organization is acting in lieu of a traditional state

9   actor." *Id.*

10      Atkinson chronicles the repeated scheming of Facebook and its officials with members of

11  various state and federal governments. In the aftermath of the 2016 election, members of the

12  United States government purportedly pressured Facebook and Zuckerberg to engage in "content-

13  based censorship of political speech" until Facebook relented and created, as a weapon of silence,

14  community standards. Opposition ("Opp.") at 12. These community standards were, according to

15  the complaints, tailored to perpetuate a narrative about the impeachment of President Donald

16  Trump, which resulted in the censorship of a wide range of political viewpoints. Atkinson admits

17  that he is "unsure of every form that [sic] government influence was brought to bear" on the

18  Defendants. *Id.*

19      A few years later, the COVID-19 pandemic altered American life completely. In order to

20  combat the spread of this deadly virus, many state governments imposed health and safety

21  measures to limit contact between people. Relatedly, according to Atkinson, these states

22  "prohibited all assemblies including those to protest their encroachment on constitutionally

23  guaranteed liberties to freedom of speech and freedom of assembly." *Id.* With these plans in mind,

24  Defendants consulted state and local governments about their safety guidelines, proceeding to

25  identify and refusing to share Facebook posts that organized gatherings protesting the stay-at-

26  home orders. To that same end, Facebook is accused of removing Atkinson's blog post detailing

27  its cooperation with the government in order to cover up that very conspiracy. This, alleges

28

United States District Court
Northern District of California

Atkinson, amounts to the state-sanctioned censorship of "political speech that the state governments find politically inconvenient." *Id*. Atkinson argues that actions taken as a result of such active, proximate collusion with state actors "may be fairly treated as [action] of the State itself." *Jackson*, 419 U.S. at 351.[5]

Construing his pleadings and arguments liberally as courts must in the case of a Plaintiff appearing *pro se*, Atkinson has made out only a weak argument that state officials dominate Facebook's decision-making. *See Villegas*, 541 F.3d at 955. His assertions boil down to vague contentions that (1) members of the United States government pressured Facebook to create vague community standards and (2) various state officials directed Facebook to remove "politically inconvenient" posts organizing protests.[6] Opp. at 12. Together, these allegations roughly suggest that state officials are involved in Facebook's decision-making process.

Contrary to the requirements of Federal Rule of Civil Procedure 8, Atkinson pleads no specific facts about which members of the United States government pressured Facebook, how they did so, or any causal connection between the alleged pressure and Facebook's actions. He has therefore pointed to no facts creating an inference "plausible on its face" that the federal government forced Facebook to create fuzzy community standards capable of being weaponized against the Trump administration. *See Twombly*, 550 U.S. at 570.

His alternate theory that state officials pressured Facebook to do their "dirty work by censoring political speech" also cannot withstand scrutiny, but for a different reason. Opp. at 12. As Defendants point out, the very CNN article Atkinson attaches to his Supplemental Complaint contradicts his assertions. Though the article starts out by stating that Facebook would be

---

[5] Inconsistently, Atkinson takes the position in his complaints that, against the backdrop of the CDA's grant of immunity to publishers, Facebook and the government work so symbiotically to *promote* freedom of speech on the internet that Facebook's action is "transform[ed]" into state action under *Burton v. Wilmington Park Authority*, 365 U.S. 715 (1961); Compl. ¶ 48; Supp. Compl. ¶ 36. This line of argument is abandoned in the Opposition so it will not be considered.

[6] Atkinson also includes the largely irrelevant points that Facebook complies with subpoenas from law-enforcement agencies but not private attorneys, Compl. ¶ 49, and Zuckerberg and other representatives from Facebook routinely testify in front of Congress. Opp. at 12.

ORDER GRANTING MOTION TO DISMISS
CASE NO.  20-cv-05546-RS

United States District Court
Northern District of California

United States District Court
Northern District of California

1   removing some posts "after consulting with officials" in a few states, a spokesperson for New

2   Jersey Governor Phil Murphy clarified that "[t]he governor's office did not ask Facebook to

3   remove pages or posts for events promoting lifting the provisions of the governor's stay-at-home

4   order." Supp. Compl. Exhibit A. Similarly, a spokesman for Governor Pete Ricketts of Nebraska

5   confirmed that Facebook reached out "to learn more about Nebraska's social distancing

6   restrictions" and it received only "publicly available information" in return. *Id.* Thus, the factual

7   landscape, even as reflected in the materials on which he relies, is not as Atkinson claims. *See*

8   *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014) (noting that courts

9   need not accept as true facts contradicted by matters properly subject to judicial notice or attached

10  as exhibits). Without facts showing that Facebook received specific directions from state officials,

11  Atkinson fails to show that state officials "dominate" Facebook's decision making. *See Villegas*,

12  541 F.3d at 955.

13       Even taking these accusations as true, they do not suggest the domination required by

14  *Villegas*, but rather some more nebulous, definitively external pressure. To be clear, even a strong

15  showing of only one of the four factors would be insufficient. Thus, Atkinson cannot demonstrate

16  that Facebook was so entwined with the State as to transform its action into state action.

17  Therefore, Atkinson stumbles at the threshold. Because he cannot show that Facebook's actions

18  are attributable to the government, he may not proceed to the substance of his First Amendment

19  claim. Consequently, it must be dismissed without leave to amend.

20       *2.  Communications Decency Act*

21       Atkinson wields the CDA as a sword and denies its applicability as a shield. He puts forth

22  the novel theory that the immunity granted to publishers under the CDA "transforms [Facebook's]

23  editorial decision-making process into management of a constructive public trust," which provides

24  the basis for a private right of action. Compl. ¶ 40. He also argues that his remaining state cause of

25  action, for breach of the implied covenant of good faith and fair dealing, is not automatically

26  precluded under the CDA specifically because it alleges a claim for relief predicated on a breach

27  of contract.

28

The CDA, codified at 47 U.S.C. § 230, was enacted in 1996 to encourage free speech in the developing internet world by protecting service providers from liability arising out of user-generated content. Section (c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Still, the CDA is clear that states may continue to enforce laws consistent with § 230, though "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

Preliminarily, Atkinson's invitation to find a new, private right of action under § 230, as well as a new application of the public trust doctrine, must be declined. In the midst of a history lesson on the internet's origins as a global public resource, Atkinson makes his point that, in passing the CDA, "the government did not extend costless immunity." Opp. at 15. He does not, however, set forth any support for the proposition that Congress intended to impose the management of a constructive public trust as the tradeoff for the receipt of publishing immunity. Additionally, Atkinson does not, and cannot, point to any textual support in § 230 for a private right of action. To the contrary, while subsections (a) and (b) set out, in specific detail, the findings and policy animating the passage of the CDA, those sections do not evince or even allude to a Congressional intent to imbue third parties with the right to sue the very internet providers to which protection was being provided. 47 U.S. C. § 230 (a) – (b). Furthermore, the public trust doctrine has never been applied outside the environmental context, and certainly not to the internet at large. The degree of departure from settled law for which Plaintiff is pressing is considerable. Without statutory, precedential, or policy basis, the public trust doctrine will not find a new application to the internet context.

Atkinson's attempts to pry his contract cause of action out from under the CDA is similarly unavailing. The Ninth Circuit has understood § 230 immunity to apply broadly: "so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process." *Carafano v.*

*Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003). To implement the application of this broad immunity, courts apply a three-prong test. *Dryoff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019). "Immunity from liability exists for (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Id.* There is no dispute that Facebook is an interactive computer service and that Atkinson, a third-party content provider, produced the content at issue. The rub, then, is whether Atkinson seeks to treat Facebook as a publisher. "[W]hat matters is not the name of the cause of action . . . what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 – 02 (9th Cir. 2009). Courts must ask: Is the duty allegedly violated derived from the defendant's role as a publisher or speaker? *Id.* at 1102. If so, § 230(c)(1) precludes legal responsibility. *Id.* Atkinson's claim turns on Facebook's editorial decision to remove, or decline to publish, his posts to its platform. This type of decision is exactly within the scope of a publisher's task to "review[] material submitted for publication" and "decide[] whether to publish it." *Id.*

Atkinson unsuccessfully attempts to analogize to the outcome of *Barnes v. Yahoo!, Inc.*, in which a plaintiff asserted a promissory estoppel cause of action against Yahoo, an internet service provider. 570 F.3d at 1107. Yahoo did not incur liability *because* the plaintiff asserted a contract cause of action, but because the court determined that Yahoo was acting as a counterparty to a contract, not a "publisher or speaker" under the CDA. *Id.* at 1107. Though Atkinson's claim is styled as a contract cause of action, he is really accusing Facebook of utilizing its community standards to make classic publishing decisions. Therefore, § 230(c)(1) immunizes Facebook from his state law causes of action.[7] Because no additional facts could cure this legal deficiency,

---

[7] Atkinson's reliance on § 230(c)(2)(A) is also misguided. Though Facebook did not assert it as an affirmative defense in its Motion to Dismiss, it need not. That provision is merely an alternative ledge on which interactive computer providers seeking immunity may perch.

1  dismissal of the claim for breach of the covenant of good faith is without leave to amend.

2  ### 3.  *Mark Zuckerberg is an Improper Party*

3  Facebook's founder Mark Zuckerberg is named only a handful of times in the Complaint

4  and Supplemental Complaint. Compl. ¶¶ 1, 5, 35, 71; Supp. Compl. ¶¶ 1, 6, 47. In neither

5  complaint does Atkinson contend Zuckerberg took any affirmative acts that could provide a basis

6  for the various claims and violations Atkinson asserts. Furthermore, Zuckerberg is not liable under

7  a theory that the corporate veil has been pierced.

8  In California, the alter ego doctrine can only be invoked after two conditions have been

9  met. *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 538 (Cal. Ct. App. 2000).

10  "First, there must be such a unity of interest and ownership between the corporation and its

11  equitable owner that the separate personalities of the corporation and the shareholder do not in

12  reality exist. Second, there must be an inequitable result if the acts in question are treated as those

13  of the corporation alone." *Id.* In applying the doctrine, courts consider the commingling of funds

14  and other assets, one entity holding itself out as responsible for the debts of the other, "identical

15  equitable ownership in the two entities," use of the same employees or offices, and the use of one

16  as a shell for the other. *Id.* at 538 – 39. Atkinson alleges none of those factors in his complaints.

17  For the first time in his Opposition, he asserts that Zuckerberg (1) owns a controlling interest in

18  Facebook's stock, which vitiates the power of other shareholders and (2) operates as the Chairman

19  and Chief Executive Officer of Facebook, which "gives him sole, direct, and final control over the

20  company's finances, policies, and business practices," so as to "completely dominate[] Facebook,

21  Inc." Opp. at 23 – 24. These allegations are too little too late. The claims against Zuckerberg must

22  be dismissed without leave to amend.

23  ### V. CONCLUSION

24  For the reasons set forth above, Defendants' Motion to Dismiss is granted with prejudice.

25

26  **IT IS SO ORDERED**.

27

28

United States District Court
Northern District of California

1   Dated: December 7, 2020

2

3   RICHARD SEEBORG
    United States District Judge

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California